**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| PULSELINK SYSTEMS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>NVIDIA CORPORATION,<br><br>Defendant. | Civil Action No. ____________<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

This is an action for patent infringement in which Plaintiff PulseLink Systems, LLC ("PulseLink" or "Plaintiff") makes the following allegations against Defendant NVIDIA Corporation ("NVIDIA" or "Defendant"):

**NATURE OF THE ACTION**

1. This is a civil action for patent infringement arising under the United States Patent Act, 35 U.S.C. § 1 *et seq*., including 35 U.S.C. § 271. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

2. NVIDIA has infringed and continues to infringe at least one claim of U.S. Patent Nos. 7,804,785 (the "'785 patent"), 8,300,614 (the "'614 patent"), 8,351,431 (the "'431 patent"), 8,565,230 (the "'230 patent"), and 8,369,220 (the "'220 patent") (collectively, the "Asserted Patents").

3. NVIDIA infringes directly, literally, and/or under the doctrine of equivalents, contributes to the infringement of, and/or induces infringement of the Asserted Patents by making, using, selling, offering for sale, and/or importing into the United States NVIDIA's data-center networking products, DPU products, Ethernet switching platforms, and related software, firmware,

and services identified herein (collectively, the "Accused Instrumentalities").

**THE PARTIES**

4. PulseLink is a Texas limited liability company with a principal place of business in Allen, Texas.

5. PulseLink owns by assignment the entire right, title, and interest in and to the Asserted Patents, including the right to sue and recover damages for past, present, and future infringement. The Asserted Patents claim foundational technologies for network packet processing and optimization, loop prevention in unified networks, multicast fast reroute, MAC address learning within dual-homed access networks using shared virtual tunnels, and flow-based route optimization, as described in the Overview of the Patented Technology below.

6. Upon information and belief, NVIDIA is a corporation organized and existing under the laws of the State of Delaware and has a place of business located at 11001 Lakeline Boulevard, Suite #100 Building 2, Austin, Texas 78717 and at 11515 Burnet Road, Austin, TX 78758. NVIDIA conducts business in Texas, and has a registered agent in Texas, where it may be served with process via its registered agent, Corporation Service Company d/b/a CSC-Lawyers Incorporated, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

7. NVIDIA designs, manufactures, markets, sells, offers for sale, and imports into the United States data-center networking products, DPU products, Ethernet switching platforms, and related software, firmware, and services throughout the United States, including in Texas and in this District.

8. NVIDIA operates and owns https://www.nvidia.com/en-us, https://marketplace.nvidia.com/en-us/, https://www.nvidia.com/en-us/support/ and related websites through which it markets, offers, and provides technical support for its products and

services, including those accused of infringement in this Complaint, through the United States, including in this District.

9. NVIDIA places, has placed, and/or contributed to placing the products and services accused of infringement in this Complaint into the stream of commerce via an established distribution channel knowing or understanding that such products and services would be sold and/or used in the United States, including in this District. NVIDIA has also derived substantial revenues from infringing acts in this District, including from the sale of such products and services and inducing or contributing to the use of such products and services by customers and users in this District.

10. Through offers to sell, sales, imports, distributions, and other related agreements relating to the products and services accused of infringement in this Complaint, NVIDIA does business in the United States, the State of Texas, and this District.

## JURISDICTION AND VENUE

11. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, et seq.

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

13. This Court has specific and personal jurisdiction over Defendant consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute. Defendant has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over NVIDIA would not offend traditional notions of fair play and substantial justice. Upon information and belief, Defendant has sufficient minimum contacts with the forum because Defendant has physical

locations and transacts substantial business in Texas and in this District. Further, Defendant has, directly or through subsidiaries or intermediaries, committed and continues to commit acts of patent infringement in Texas and in this District as alleged in this Complaint.

14. Venue is proper in this Judicial District pursuant to 28 U.S.C. §§ 1391 and 1400(b).

15. NVIDIA is registered to do business in Texas and, upon information and belief, NVIDIA has transacted business in this District, has committed acts of direct and indirect infringement in this District, and, on information and belief, has regular and established places of business in this District, as set forth herein. NVIDIA is subject to personal jurisdiction in this District and has committed acts of patent infringement in this District. On information and belief, NVIDIA through its own acts and/or through the acts of others, makes, uses, sells, offers to sell, and/or imports infringing products within this District, regularly does and solicits business in this District, and has the requisite minimum contacts with the District, such that this venue is a fair and reasonable one.

16. Venue is proper because, on information and belief, NVIDIA has regular and established place of business in this District, including as follows.

17. NVIDIA is both a supplier of networking equipment and a direct investor in data center facilities where its networking products, including, on information and belief, Accused Instrumentalities, are deployed in Texas and this District. On information and belief, Nvidia resides at and has control over such facilities in Texas and this District as described below.

18. NVIDIA, through its relationship with Lambda, Inc. ("Lambda"), resides in this District, including at facilities in Plano, Texas and Allen, Texas. NVIDIA and Lambda maintain a highly integrated, multi-faceted relationship where NVIDIA operates simultaneously as Lambda's most critical supplier, a key equity investor, and its largest customer. Founded as an AI-focused

cloud and hardware provider, Lambda has built its entire $5+ billion business model around deploying, leasing, and managing NVIDIA GPU infrastructure. While Lambda operates as an independent, privately held "neocloud" preparing for a potential IPO, NVIDIA exerts significant operational, economic, and strategic control over the company through market leverage, circular financing, and supply chain dominance.

19. NVIDIA's control over Lambda exists as a result of the overwhelming concentration of economic and operational leverage NVIDIA possesses with regard to Lambda. During periods of severe global chip shortages, Lambda relies on its status as a seven-time "NVIDIA Partner of the Year" to secure priority hardware allocations over competitors. Because NVIDIA decides which cloud providers receive its latest chips (such as the H100, B200, and GB300) and in what quantities, NVIDIA possesses the unilateral power to dictate Lambda's growth, inventory scale, and market viability. *See, e .g.*, https://finance.biggo.com/news/a7cca26c-db69-4460-8f40-2503c31f4a6f

20. NVIDIA exercises control over Lambda through a financial loop where capital flows between the two companies in multiple directions, effectively tethering Lambda's balance sheet to NVIDIA. NVIDIA is a direct equity backer in Lambda, injecting capital to help fund Lambda's massive infrastructure build-outs. In September 2025, NVIDIA signed a $1.5 billion, multi-year agreement to lease back 18,000 GPU servers directly from Lambda. This made NVIDIA the largest customer of its own hardware. This circular arrangement allows NVIDIA to recognize immediate hardware sales revenue from Lambda, while using its own balance sheet to subsidize Lambda's operations via server leases. Consequently, Lambda is financially dependent on NVIDIA not just for the capital to buy the hardware, but for the recurring leasing revenue required to service its multibillion-dollar debt.

https://www.moomoo.com/news/post/58067552/nvidia-has-invested-1-5-billion-to-rent-gpu-servers?utm_source=gemini&level=1&data_ticket=1790566053959582.

21. Lambda's corporate finance strategy is entirely dictated by the need to purchase NVIDIA hardware, giving NVIDIA indirect control over Lambda's capital structure. Lambda's infrastructure is inextricably bound to NVIDIA's proprietary technological ecosystem, removing any realistic ability for Lambda to pivot to alternative suppliers. Lambda's proprietary "Lambda Stack" software is expressly curated to manage NVIDIA GPU drivers and run on NVIDIA's CUDA architecture. Transitioning to a competitor like AMD or custom hyperscaler silicon would require Lambda to rebuild its entire software orchestration layer and data center networking fabric from the ground up.

22. Consistent with its control relationship with Lambda, "NVIDIA, the dominant force in AI hardware, has entered into a $1.5 billion agreement with cloud services provider Lambda that highlights the extraordinary demand for GPUs and the unconventional ways they are being sourced…. NVIDIA [has] lease[ed] back 18,000 of its own GPUs from Lambda over a four-year period…. The agreement reportedly consists of two components: a four-year lease for 10,000 GPUs valued at approximately $1.3 billion, followed by a $200 million arrangement covering an additional 8,000 processors, believed to be older or less advanced models. The hardware was originally purchased from NVIDIA by Lambda, which specializes in leasing GPU-powered servers to organizations building large-scale AI systems. NVIDIA, which has previously invested in Lambda, now appears to be securing capacity from the same company as it looks to meet surging internal demand…. [T]hese deployments are primarily for [NVIDIA] internal projects rather than being resold to customers through public cloud platforms." *See, e.g.*, https://hostingjournalist.com/news/nvidia-strikes-1-5b-deal-to-lease-back-18-000-gpus-from-

lambda.

23. NVIDIA's $1.5 billion lease of data center infrastructure and AI cloud platform from Lambda for NVIDIA's own use includes facilities located throughout the United States, including facilities in this District located in Plano, Texas and Allen, Texas. Given the deep levels of control that NVIDIA exercises over Lambda, NVIDIA and its employees have access to at least portions of these facilities. *See, e.g.*, https://reserve76.com/blog/nvidia-backed-lambda-to-occupy-dollar700m-ai-data-center-in-plano ("Lambda leverages NVIDIA's processors to power its AI Cloud platform, which provides scalable GPU compute for enterprise and research needs. The new facility in Plano is designed to host the latest Nvidia GPU hardware to support complex machine learning, large language models, and data-intensive AI workloads."); https://hostingjournalist.com/news/nvidia-strikes-1-5b-deal-to-lease-back-18-000-gpus-from-lambda ("these deployments are primarily for [NVIDIA] internal projects rather than being resold to customers through public cloud platforms").

24. The Plano, Texas facility, also known as DFW-04, is a 425,000 square feet, $700M AI datacenter that Lambda and Aligned Data Centers partnered to build at 601 North Star Road, Plano, Texas. *See, e.g.*, https://www.planotexas.org/current-news?contentId=fc42f8d3-9dab-4c31-897f-d15a890cb904; https://www.cbre.com/insights/data-center; https://www.datacentermap.com/usa/texas/dallas/aligned-dfw-04/.

25. The Allen, Texas facility is a co-location facility for GPU-based cloud compute. *See, e.g.*, https://www.datacenterdynamics.com/en/news/lambda-labs-close-to-raising-300-million-for-ai-cloud/; https://www.datacenterdynamics.com/en/news/lambda-to-deploy-gpu-cluster-at-primes-lax01-data-center-in-california/ (noting existing Allen, Texas location); https://www.highperformr.ai/company/lambda-cloud ("Specific data center address not publicly

disclosed for security reasons; facility located in Allen, TX.”); https://www.datacenterdynamics.com/en/news/lambda-labs-close-to-raising-300-million-for-ai-cloud/ (noting Allen, Texas location and Lambda’s use of NVIDIA GPUs).

26. The Plano and Allen facilities comprise data center infrastructure and an AI cloud platform utilizing NVIDIA’s GPUs, switches and processors, including Accused Instrumentalities. *See, e.g.*, https://reserve76.com/blog/nvidia-backed-lambda-to-occupy-dollar700m-ai-data-center-in-plano; https://aligneddc.com/press-release/aligned-and-lambda-partner-to-power-next-generation-ai-infrastructure-6/ (“The data center will feature NVIDIA’s latest processors and technology.”).

27. Given NVIDIA’s extensive operational and financial control over Lambda, including at least the Lambda facilities in Plano and Allen, Texas, within this District, Lambda operates as a direct extension of NVIDIA’s commercial enterprise and constitutes a regular and established place of business. The facilities are expressly designed to house the Accused Instrumentalities. These facilities are built to deploy NVIDIA’s proprietary AI infrastructure at scale, strictly requiring the installation of NVIDIA GPUs, Spectrum series switching systems, and the associated networking equipment that implement the accused multicast failover and MLAG-related forwarding functionality. Because Lambda’s infrastructure deployment is inextricably tethered to NVIDIA’s hardware allocations and leasing agreements, the Plano data center functions as a critical operational hub executing NVIDIA’s business strategies, assuring the widespread deployment and active use of the infringing systems within the facility. https://reserve76.com/blog/nvidia-backed-lambda-to-occupy-dollar700m-ai-data-center-in-plano?utm_source=gemini#:~:text=The%20facility%2C%20DFW%2D04%2C%20will%20span%20425%2C000%20square,physical%20infrastructure%20required%20to%20scale%20artificial

%20intelligence;
https://lambda.ai/?utm_source=gemini#:~:text=The%20engines%20of%20superintelligence.%20Give%20your%20team,NVIDIA%20HGX%20B200.%20Versatile%20fine%2Dtuning%20and%20inference.

28. Moreover, NVIDIA exercises direct operational and strategic control over physical facilities within this District through its founding role in the AI Infrastructure Partnership, which recently acquired data center developer Aligned Data Centers ("Aligned") in a $40 billion transaction. This unprecedented acquisition was not a passive real estate investment, but a strategic necessity engineered to secure captive, purpose-built infrastructure capable of supporting NVIDIA's extreme power, cooling, and networking demands. Because standard third-party data centers cannot readily accommodate the requirements of large-scale AI superclusters, NVIDIA must actively utilize its controlled Aligned facilities as dedicated "AI factories" to deploy, operate, and maintain its proprietary hardware ecosystem, including the accused Spectrum switching systems.

29. Aligned owns over 6.4 gigawatts of capacity and is heavily anchored in Plano, Texas, operating multiple facilities under NVIDIA's strategic umbrella. These include DFW-01 and DFW-02 (adjacent 19-acre campuses located at 2800 Summit Ave, Plano, TX 75074) and the massive 44-acre DFW-04 campus. By dictating the architectural integration of the accused instrumentalities within these data centers and utilizing Aligned's footprint to execute its commercial AI networking strategies, NVIDIA has established these Plano locations as its own operational hubs. On information and belief, based on NVIDIA's structural control over Aligned and the physical necessity of deploying its infringing hardware within these captive facilities, NVIDIA maintains a regular and established place of business, and therefore resides, in this

District. (See, e.g., https://www.esgdive.com/news/blackrocks-gip-microsoft-backed-ai-group-buy-aligned-data-centers-for-40/825920/; https://www.crn.com/news/data-center/2025/aligned-data-centers-set-to-be-acquired-for-40-billion).

30. Furthermore, NVIDIA maintains a regular and established place of business in this District through its pervasive operational and financial control over the manufacturing operations of Coherent Corporation ("Coherent") in Sherman, Texas. NVIDIA has functionally transformed Coherent from a third-party supplier into a captive manufacturing arm for its proprietary AI infrastructure. In March 2026, NVIDIA injected $2 billion directly into Coherent, tethered to a multibillion-dollar purchase commitment, specifically to dictate and fund Coherent's research, development, and U.S.-based manufacturing capacity. (See, e.g., https://www.coherent.com/news/press-releases/nvidia-and-coherent-announce-strategic-partnership).

31. This immense capital investment is physically manifested in this District at Coherent's Sherman, Texas manufacturing campus. In June 2026, Coherent broke ground on a $650 million expansion of this Sherman facility—a localized expansion so integral to NVIDIA's core business operations that NVIDIA founder and CEO Jensen Huang personally attended the groundbreaking ceremony. (See https://blogs.nvidia.com/blog/coherent-texas-ai-optical/). Building upon a two-decade-long supplier relationship, the Sherman campus now operates as a dedicated hub supplying components across NVIDIA's entire AI infrastructure stack.

32. NVIDIA has publicly ratified the Sherman facility as a critical extension of its own manufacturing footprint, openly acknowledging that the factory does not merely produce generic, drop-in components. Rather, NVIDIA confirms the Sherman facility manufactures "the lasers, transceivers and pluggable optical modules that move data across NVIDIA networking—each

enabling a different part of the system." (*See id.*) On information and belief, because NVIDIA exercises extensive financial and operational control over the Sherman facility's output, exclusively financed its physical expansion in this District, and publicly holds the campus out as a vital component of its own production capabilities, the Sherman facility constitutes a regular and established place of business of NVIDIA.

33. Further, NVIDIA is building supercomputer manufacturing plants in Texas, with Foxconn in Houston, Texas and with Wistron in Fort Worth, Texas. *See, e.g.*, https://blogs.nvidia.com/blog/nvidia-manufacture-american-made-ai-supercomputers-us/ ("NVIDIA is working with its manufacturing partners to design and build factories that, for the first time, will produce NVIDIA AI supercomputers entirely in the U.S."). According to NVIDIA's founder and CEO, NVIDIA "[a]dding American manufacturing helps [NVIDIA] better meet the incredible and growing demand for AI chips and supercomputers, strengthens [NVIDIA's] supply chain and boosts [NVIDIA's] resiliency." https://blogs.nvidia.com/blog/nvidia-manufacture-american-made-ai-supercomputers-us/. Wistron's Fort Worth facility, known as Wistron's D1 facility, manufactures CPU and GPU superchips for NVIDIA. "NVIDIA has committed to manufacturing up to $500 billion in advanced AI platforms in the United States. The Wistron Fort Worth factory is one of the projects making that number real….Wistron's factory is part of NVIDIA's broader commitment to build in America, for America — strengthening U.S. supply chains, creating high-skilled jobs and giving American communities a direct role in building the future with AI." https://blogs.nvidia.com/blog/wistron-manufacturing-texas/.

34. PulseLink has been injured by Defendant's acts of infringement, and that injury is continuing.

## FACTUAL BACKGROUND

35. PulseLink is the owner by assignment of the entire right, title, and interest in and to the Asserted Patents, including all rights to recover for past and future infringement.

36. The Asserted Patents claim foundational technologies in data-center networking and enterprise network infrastructure. The ’785 patent concerns, for example, a network system architecture employing an instructional sequence for performing and optimizing packet processing across multiple virtualized networks using Virtual-Service-Modules, fast-path and slow-path processing, combined action lists, and an optimizer to merge, reorder, and reduce primitive operations for increased processing efficiency. The ’614 patent concerns, for example, loop detection and prevention in networks, using a set of rules for qualifying connections as virtual tunnels or physical connections and defining a single path where multiple potential paths exist. The ’431 patent concerns, for example, fast rerouting of multicast packets within a network element to an available port associated with a multi-link trunk using synchronized local port state databases and Forwarding Data Units (FDUs). The ’230 patent concerns, for example, systems and methods for MAC address learning within dual-homed access networks using shared virtual tunnels with a single virtualized source device address representing multiple transport devices. The ’220 patent concerns, for example, elastic and inelastic traffic flow routing that selects paths based on real-time traffic performance measurements and route utilization to divert flows away from congestion points and load balance.

37. The Asserted Patents are rooted in the pioneering research and development of Avaya Inc., a recognized industry leader that engineered foundational and pioneering architecture for enterprise networking, unified communications, and data-center switching. Avaya’s inventors successfully solved complex architectural challenges, yielding paradigm-shifting patents in

network packet processing, loop prevention, multicast rerouting, MAC-learning stabilization in tunneled transport networks, and flow-based route optimization. PulseLink holds all right, title, and interest in and to the Asserted Patents, having acquired them through an established, unbroken chain of title from Avaya and its successors.

**THE ASSERTED PATENTS**

**United States Patent No. 7,804,785**

38. On September 28, 2010, the United States Patent and Trademark Office duly and legally issued United States Patent No. 7,804,785, entitled "Network System Having an Instructional Sequence for Performing Packet Processing and Optimizing the Packet Processing." The '785 patent is attached as **Exhibit 1**.

39. The '785 patent names Dave Roberts, Jeffrey Stuart Hansell, and Praveen Ghanashyam Shekokar as inventors.

40. PulseLink owns by assignment the entire right, title, and interest in and to the '785 patent, including all rights to sue and recover damages for past and future infringement.

41. The '785 patent addresses a failure in network packet-processing equipment. Before the invention, a typical networking system "implemented single function, fixed functionality per network element," and even the first generation of virtualized systems fixed functionality on a per network element basis. *Id.* at 1:25-29. Those limits imposed engineering costs because, for example, each individual network element had to "take the time and resources to make a decision on how to process an incoming data packet," so service availability, bandwidth, and quality of service degraded as the combined time and combined resources consumed across the network grew. *Id.* at 1:32-39.

42. A POSITA would have understood that the '785 patent improves upon prior data

center arrangements. In data center arrangements prior to this '785 patent, a network system contained network elements, such as a firewall, a load balancer, a traffic manager, and a router. Those elements each received packets, identified the source and destination, processed the packets, and distributed the flow to a server. *Id.* at 1:39-53; Fig. 1. Each component resolved the processing and routing of the same packets, duplicating work already done upstream. *Id.* at 1:62-64.

43. A POSITA would have understood that the two packet-processing techniques available in the prior art each carried a distinct defect. In packet-by-packet processing, "each packet is processed identically through the main processing algorithm and associated packet-processing components," with no shortcut for packets whose handling was already known. *Id.* at 2:2-5. In known fast-path processing, a system checked each packet to decide whether it took a fast path or a slow path, where the slow path performed the "full" processing and examined the packet "for various special cases that may exist in the processing algorithm," a process that "takes time and slows down the processing." *Id.* at 2:15-21.

44. Known fast-path systems made that path decision without regard to the state of the network. The '785 patent explains that known "fast-path processing algorithms employ a stateless decision as to whether to use the slow path processing or fast path processing" and they decided on path processing "[s]imply by examining the packet itself," e.g., a standard IP router might inspect the IP header for options and defaults any packet carrying options to the slow path. *Id.* at 2:30-36. The '785 patent identifies the resulting deficiency as the known fast-path architecture "not typically optimiz[ing] the processing of the packet." *Id.* at 2:40-44.

45. The inventors recognized these problems and an unexploited regularity in network traffic. For instance, "[t]here is often great commonality in processing various packets," because "packets often belong to higher-level sessions and flows from these sessions often travel the same

paths and receive the same processing in a given node….” *Id.* at 2:46-54. Prior systems did not capture that commonality, and they did not eliminate the duplicative low-level operations that multiple network elements each demanded on the same packet.

46. A POSITA would have understood that the ’785 patent solves those problems. The patent describes a network system in which packet-processing functionality resides in an virtual graph of connected Virtual-Service-Module nodes, where each node is “modeled roughly along the lines of individual network elements in the real world.” *Id.* at 5:11-16. A Virtual-Service-Module may implement functionality approximately that of a standalone IP router, an Ethernet switch, a virtual private network, a filter or firewall, a load balancer, a bridge, or a network address translator, and those nodes are then composed in the virtual graph similar to the way they would be in the real world. Packet processing across the system is governed by the configured graph rather than by the independent decisions of isolated appliances. *Id.* at 4:43-45; 5:15-47.

47. A POSITA would have understood that the ’785 patent teaches that “the composition and topology of the Virtual-Service-Modules modeled to represent network elements may be arbitrarily assembled,” so different individual networks within the same system may contain different network elements. *Id.* at 5:22-28. Physical ports on a network switch attach to the virtual graph at various points such that the internal virtual system to external components are coupled. *Id.* at 5:28-31.

48. When a related packet flow enters the system, support framework software builds an ordered sequence of the nodes the flow’s packets will traverse using the virtual graph. For example, a firewall Virtual-Service-Module, then a load-balancing Virtual-Service-Module, then a router Virtual-Service-Module. *Id.* at 5:47-53. Because every packet in the flow carries the same routing data, every packet may take a known path, and the system can determine that sequence

once and reuse it. *Id.* at 7:7-9.

49. Each node then specifies the processing it requires as "an ordered list of processing primitive operations called an Action List." *Id.* at 7:15-17. The system collects those action lists and creates a Combined Action List, e.g., "the total set of ordered processing primitives contributed by all the nodes the packet visits." *Id.* at 7:18-21. Once the system builds that combined list for a flow, the system "can simply apply the various primitive operations specified by the combined list and pass the transformed packet to the output port" identified by the node sequence. *Id.* at 7:21-28.

50. The '785 patent specifies the primitive operations. For example, an exemplary instruction set contained within a single block of logic, e.g., a generic fast-path processing engine, includes thirty-one primitive operations, among them full IP network address translation, source and destination IP network address translation, full and partial TCP/UDP port address translation, TCP sequence number update, TCP acknowledgment number update, TCP window size adjustment, incremental IP, TCP, and UDP checksum updates, TTL decrement, IP header length comparison, destination and source MAC address overwrite, EtherType overwrite, conditional primitives, and packet duplication. *Id.* at 10:5-18. The '785 patent generally describes primitive operation as "a single, primitive instruction packet transformation operation," and/or as "an instruction based operation supported by the particular programming language being employed" that "performs an operation on the packet being processed." *Id.* at 10:22-24; *see also id.* at 8:60-64.

51. The claimed system routes packets between two different processing paths. The first path (e.g., fast path) consists of dedicated logic "such as a FPGA or ASIC, that is able to perform the same operation efficiently on a set of packets within a given flow of related packets,"

and it remains “limited in its packet processing decision making capacity by the amount of primitive operations in an instruction set contained in the fast path logic.” *Id.* at 8:42-48. The second path (e.g., the slow path) “processes packets that are an exception to the primitive operations in the instruction set contained in the fast path logic,” and may comprise a “general purpose processor cooperating with software or firmware to perform packet processing.” *Id.* at 8:51-57. The ’785 patent pairs a processor with a hardware acceleration device, such as an ASIC, and divides packet processing between the two. *Id.* at 13:36-43.

52. A POSITA would have understood that unlike the previous systems, the claimed path selection utilizes a stored flow state. The fast-path processing check “may employ a processing algorithms that has decision logic that is ‘stateful,’” and the two paths “communicate state information between themselves and the decision logic in each fast-path processing check.” *Id.* at 7:60-65. That state information tells the decision logic which packets should be processed on the fast path and it tells the fast path what type of processing should occur. The slow path identifies the start of a previously unidentified flow, determines how the flow should be handled, and supplies the decision logic with a characterization of the flow so that the decision logic can recognize the flow and direct subsequent packets to the fast path, e.g., in one embodiment a TCP flow tuple of source IP address, destination IP address, source port, and destination port. *Id.* at 8:18-25. When the flow terminates, the fast-path logic recognizes that condition and signals it so both entities remove the associated state, after which a later packet matching the same criteria no longer finds state making it fast-path eligible. *Id.* at 8:33-41.

53. A POSITA would have understood that because many different network elements “use the same sorts of primitive operations,” the combined list assembled from all nodes contains redundancy, and “[c]ertain combinations can be merged into a single operation that encompasses

the [sum] total of two or more individual primitive operations on the single data packet." *Id.* at 7:29-37. The '785 patent places a combined action list optimizer between the point where the combined list is assembled and the fast-path processing engine. *Id.* at 11:12-15. That optimizer applies a set of rules to combine, remove and reorder individual primitive operations from the combined action list in order to generate an optimized combined action list having fewer individual primitive operations. *Id.* at 11:17-21. It "checks for redundant primitive operations and other primitive operations that are made obsolete by performing a Subsequent primitive," because "some actions can logically be combined into a single action, and other actions may be fully redundant when other primitive operations are present in the combined action list." *Id.* at 12:41-49.

54. The '785 patent discloses the optimization rules and quantifies their effect. For example, the rules merge source or destination NAT with a subsequent full NAT, delete all full NAT operations other than the last, merge destination and source NAT into a single full NAT, combine PAT operations, and merge incremental TCP and IP checksum updates "into a single TCP checksum update with a combined differential" and "a single IP checksum update with a combined differential." *Id.* at Fig. 10 (and corresponding disclosures). In one embodiment having a four-node sequence (e.g., firewall, Layer 7 server load balancer, prioritization, and final router), the '785 patent describes generating a combined action list of nine primitive operations, which the optimizer reduces to six by eliminating the null operation and most of the IP checksum recalculations and by moving the TCP checksum calculation to the end, after all TCP/IP modifications have occurred. *Id.* at 13:16-28. A separate example describes a combined list of eighteen individual primitives before optimization. *Id.* at 11:58-61.

55. A POSITA would have understood that the exact optimization rules are highly dependent on the semantics of the actual primitive operations themselves, and each rule may

ensure that the resulting optimized combined action list performs identically to the original combined action list when processed by the processing engine. The ’785 patent compares those rules to “the optimization rules and algorithms performed on microprocessor code by an optimizing programming language compiler.” *Id.* at 12:61-64.

56. The ’785 patent ties the optimization to a measurable benefit, e.g., “an optimized action list containing fewer primitive operations indicates less processing time and a consequently higher aggregate throughput for the entire processing engine.” *Id.* at 12:52-55. The patent further explains that merging the fast-path functionality of executable primitives yields an engine “much smaller in size on chip,” and that the resulting engine “may also be much faster, because smaller silicon implementations typically run faster than larger implementations.” *Id.* at 11:28-34. Consolidating the path decision produces a further gain. For example, rather than performing one fast-path check per network element function, e.g., checks that “take time and must be performed for each function, even if all the functions elected to use fast-path processing,” the optimized architecture makes “a single stateful decision” covering all functional blocks. *Id.* at 9:40-41; *see also id.* at 9:2-10.

57. A POSITA would have understood that the improvement the claims deliver is an improvement to the computer and network technology itself, not the use of a computer as a tool to perform a pre-existing task. The specification identifies the deficiency in prior packet-processing machines, e.g., those machines “did not typically optimize the processing of the packet,” and their path decisions were made statelessly, by inspecting each packet in isolation, and it identifies the specific technical solution for solving that problem. *Id.* at 2:40-44. The benefits the ’785 patent recites are machine-level benefits, e.g., fewer primitive operations applied per packet, less processing time, higher aggregate throughput for the processing engine, a smaller and faster fast-

path engine on silicon, and fewer stateful path decisions in place of a separate decision for each network element function. *Id.* at 12:52-55.

**United States Patent No. 8,300,614**

58. On October 30, 2012, the United States Patent and Trademark Office duly and legally issued United States Patent No. 8,300,614, entitled "Preventing Packet Loops in Unified Networks." The '614 patent is attached as **Exhibit 2**.

59. The '614 patent names Shashi H. Ankaiah, Vivek L. Atreya, Kumara Das Karunakaran, and Seemant Choudhary as inventors.

60. PulseLink owns by assignment the entire right, title, and interest in and to the '614 patent, including all rights to sue and recover damages for past and future infringement.

61. The written description of the '614 patent describes in detailed technical terms each limitation of the claims, including claims 1, 2, and 7, enabling a person of ordinary skill in the art to understand both the scope of the claims and how its non-conventional and non-generic combination of computer-implemented method steps departs from and improves upon what was considered conventional in unified network forwarding and loop prevention at the time of the invention.

62. For instance, the '614 patent is directed to a concrete, rules-based loop-prevention framework for packet forwarding in unified split-plane mobility domains comprising both physical connections and virtual tunnels. '614 patent at 1:55–2:10. The claimed framework operates on a topology of unified switches and applies forwarding rules to select an appropriate path for a packet based on the destination and the type of available connection. *Id.* at 5:1–20.

63. The '614 patent addresses a technical problem in unified networks. In such networks, a unified switch may have multiple ports capable of reaching the same destination

through a mixture of physical connections and virtual tunnels, creating multiple possible mappings for the destination and a routing loop across switches supporting both types of connections. *Id.* at 2:55–67. Conventional wired networks employed a time-to-live (TTL) value to guard against looped or lost packets by specifying a maximum number of hops after which a packet terminates. *Id.* at 3:1–17. But a packet subject to that mechanism continues to consume routing and processing resources until the TTL is exhausted, and the underlying message must be replicated if it is to be completed. *See id.* In conventional Layer 2 switching, multiple paths may also be selected for the same packet when the destination indicates a multicast or broadcast frame or when there is no forwarding-database entry for an unknown unicast. *Id.* at 6:28–50. If the forwarding path contains multiple paths across devices in the same VLAN, those packets can circulate indefinitely, causing infinite loops, traffic disruption, and continued consumption of network resources. *See id.*

64. The patent discloses identifying a topology of unified switches; identifying links between the switches; computing, based on a destination, at least one port corresponding to the destination; determining whether forwarding on a particular port causes a loop; identifying a loop rule indicative of another port; and forwarding on the identified port, which corresponds to a different type of connection—tunnel or physical—than the port causing the loop. *Id.* at 3:28–56. The patent further discloses a proactive configuration that prevents looping routing decisions before packets circulate through the network. *Id.* at 7:1–15. Mobility switches that provide physical connectivity for a VLAN use the ports associated with those physical connections to forward traffic in that VLAN; those switches are treated as VLAN servers. *Id.* at 8:55–9:10. A switch uses ports associated with mobility tunnels only when there is no physical connectivity for the VLAN; those switches operate as client switches. *Id.* at 9:5–15. When multiple tunnel ports on a client switch provide connectivity to the same VLAN, the client switch selects only one tunnel port under

a load-balancing or other selection rule, because forwarding on all such tunnel ports could create a packet loop. *Id.* at 9:15–25. The mobility switches also follow a "break before make" rule when switching or failing over from one VLAN server to another, so that the outgoing VLAN membership is removed before the replacement membership is established. *Id.* at 9:25–35.

65. The '614 patent's forwarding pipeline is concrete and operational. The control layer manages VLAN membership for each physical or logical port, qualifying the available links as physical connections or virtual mobility tunnels under the loop-prevention rules. *Id.* at 11:35–52. Control-message handling detects potential loops and enforces those rules by adding or removing VLAN membership for the relevant tunnel and physical ports. *Id.* at 11:35–45. The forwarding logic then makes the forwarding decision through ordinary Layer 2 switching using the resulting VLAN membership, rather than through a newly modified or non-standard forwarding algorithm. *Id.* at 11:45–55. This arrangement keeps the forwarding path standard and efficient and permits the loop-prevention functionality to be implemented using existing ASIC forwarding-logic blocks. *See id.* at 6:59–66, 11:50–55.

66. Claim 1 of the '614 patent recites the complete loop-prevention sequence. Claim 2 further requires computing a set of links defining a loop, with each link accessible for forwarding through a port, and determining that the loop causes a routing path back to a node from which the packet was previously sent. *Id.* at 9:55–10:10. Thus, the claim requires more than identifying an abstract possibility of a loop: it requires computing the port-accessible links that form the return path and recognizing the packet's return to a previously traversed unified switch or node. *See id.* at 12:38–50, 13:1–12.

67. Claim 7 further requires determining that the destination is accessible by both a physical connection and a virtual tunnel, with the identified loop rule directing invocation of the

physical connection for forwarding the packet. *Id.* at 13:25–33. Claim 8 addresses the circumstance in which multiple virtual tunnels define separate paths that include distinct unified switches; in that circumstance, the rule set associates one of the distinct switches with packet forwarding rather than allowing the packet to be sent through each available tunnel. *Id.* at 13:34–45. Claim 9 further adds load balancing of mobile devices among distinct switches operating as VLAN servers and client switches, while preserving the loop-prevention rules governing which physical or virtual port may forward traffic. *Id.* at 13:45–55. These limitations capture the patent's concrete selection of one permitted path from competing physical and virtual alternatives. *See id.* at 13:25–33.

68. The ordered combination of topology identification, destination-based port computation, loop-defining link analysis, proactive VLAN-membership control, loop-rule selection, single-path selection, and type-different forwarding departs from conventional TTL-based or control-plane-dependent loop avoidance. The claimed operations work together as an integrated pipeline: the control layer identifies the physical and virtual topology and programs VLAN membership; the forwarding plane uses that membership to exclude the loop-causing port; and the switch forwards through the permitted physical or virtual alternative using standard Layer 2 and ASIC forwarding logic. *See id.* at 7:1–15, 11:35–55. A person of ordinary skill in the art would understand that the asserted '614 claims reflect a substantial, non-conventional, and valuable contribution to unified split-plane networking—a non-conventional and non-generic arrangement of known networking components operating together to prevent packet loops, duplicate forwarding, and resource-consuming circulation. *See id.* at 3:28–56, 9:1–35, 11:35–55.

**United States Patent No. 8,351,431**

69. On January 8, 2013, the United States Patent and Trademark Office duly and legally issued United States Patent No. 8,351,431, entitled "Method and Apparatus for Providing Fast

Reroute of a Multicast Packet Within a Network Element to an Available Port Associated with a Multi-Link Trunk." The '431 patent is attached as **Exhibit 3**.

70. The '431 patent names Hamid Assarpour as inventor.

71. PulseLink owns by assignment the entire right, title, and interest in and to the '431 patent, including all rights to sue and recover damages for past and future infringement.

72. The '431 patent is directed to a concrete, hardware-implemented fast-reroute framework for multicast packets within network elements interconnected by multi-link trunks. It addresses a technical problem in conventional network systems where port failures caused unacceptable delay and packet loss because the control plane had to intervene and redirect traffic, a process too slow to maintain acceptable network performance. '431 patent at Abstract, 1:39–59. Specifically, conventional mechanisms suffered from a variety of deficiencies described in the patent. One such deficiency is the amount of time taken by conventional network elements to recover from a failure. *Id.* at 2:8-14. The longer the amount of time taken to recover the longer the delay in performance (including more dropped packets) as well as the loading of other ports to overcome for the failed port.

73. To overcome these deficiencies, the disclosed framework receives a multicast packet at a Forwarding Data Unit ("FDU") in the data plane, determines the packet is multicast, distributes copies to all egress FDUs supporting receiver-associated ports, and performs a lookup in a synchronized local port state database to identify a port in an UP state—all without control-plane intervention—thereby enabling sub-ten-millisecond failover and decoupling traffic rerouting from slow control-plane recovery. *Id.* at 2:15-41.

74. The invention overcomes this deficiency by providing novel mechanisms and techniques that provide a fast re-route of a multicast packet within a network element to an

available port associated with a multi-link trunk. Specifically, the '431 patent discloses receiving a packet by an FDU in the data plane of a network element; determining that the packet is a multicast packet; forwarding the packet to all egress FDUs having at least one port associated with at least one receiver of the multicast packet, including determining whether a receiver port is a stand-alone port, a Multi-Link Trunk ("MLT") group for a local FDU, or an MLT group for a remote FDU, and forwarding a copy to each MLT member; and performing a lookup by each egress FDU in a synchronized local port state database to find a port for each receiver that is in an UP state. The port is thus selected dynamically in hardware from current port-state information and the MLT group membership, rather than from a static forwarding database updated by the control plane. For example, where a receiver is reachable via a Split MLT ("SMLT") spanning two physical switches, the egress FDUs on both the local and remote nodes evaluate their synchronized port databases in parallel to identify a single UP port and suppress duplicate delivery. *Id.* at 2:31-67.

75. Dependent claims 3 and 5 further narrow this operation for the local-FDU scenario. Claim 3 requires that, when the receiver port is an MLT group for a local FDU, the method includes locating a local port member from the local port state table that is in an UP state. *Id.* at 15:62-65. Claim 5 further specifies that an MLT Identifier ("ID") and hash value are used to perform the lookup in the local port state database. *Id.* at 16:1-3. The MLT-ID identifies the applicable link-aggregation group, and the hash—computed from selected fields of the packet header—selects among the active physical members of that group, enabling deterministic, load-balanced port selection across the remaining UP ports without shifting all traffic to a single designated backup.

76. Claims 6 through 9 further narrow the claimed reroute sequence for the remote-FDU scenario. Claim 6 requires checking remote port tables to determine whether any MLT ports

on the originating network element are in the UP state. *Id.* at 16:4-8. Claims 7 and 8 specify the forwarding logic: when at least one MLT port on the originating node is UP, the remote FDUs drop the packet (claim 7); when all MLT ports on the originating node are down, one remote port is selected to transmit the packet while all other remote ports drop it (claim 8). *Id.* at 16:8-15. Claim 9 further requires that an MLT Identifier and hash value are used to perform the lookup in the remote port state database. *Id.* at 16:15-17. These limitations specify a coordinated, two-stage failover process between local and remote nodes that prioritizes local forwarding and falls back to deterministic remote port selection only when local capacity is fully exhausted.

77. The combination of data-plane multicast detection, synchronized port state databases maintained across local and remote FDUs, MLT-ID and hash-based port lookup, deterministic single-port selection with duplicate suppression, and automatic failover across clustered network elements provides a concrete, hardware-implemented rerouting pipeline that departs from conventional control-plane-dependent recovery mechanisms. The written description provides detailed implementations of port state databases with local and remote tables, heartbeat-based synchronization between FDUs within and across network elements, database control logic that offloads port selection from the FDU, and the specific operations by which the framework evaluates MLT membership and port state to select an available port.

78. Accordingly, a person of ordinary skill in the art reviewing the '431 patent's specification would understand that the inventors had possession of the claimed subject matter and would know how to practice the claimed inventions without undue experimentation. Together, the Asserted Patents reflect substantial, non-conventional, and valuable contributions in the technology area of fast multicast rerouting in multi-link trunk network environments. A person of ordinary skill in the art would further understand that the inventive claims describe a non-

conventional and non-generic arrangement of known, conventional pieces—including data-plane multicast packet detection, synchronized local and remote port state databases, MLT-ID and hash-based lookup, deterministic port selection, and duplicate-suppression forwarding logic—that operates as an integrated fast-reroute pipeline rather than a collection of generic network forwarding components.

**United States Patent No. 8,565,230**

79. On October 22, 2013, the United States Patent and Trademark Office duly and legally issued United States Patent No. 8,565,230, entitled "Shared Virtual Tunnels Supporting MAC Learning in Communication Networks." The '230 patent is attached as **Exhibit 4**.

80. The '230 patent names Srikanth Keesara, Sakthivadivu Saravanaraj, Liming Sun, and Roger Lapuh as inventors.

81. PulseLink owns by assignment the entire right, title, and interest in and to the '230 patent, including all rights to sue and recover damages for past and future infringement.

82. The '230 patent is directed to a concrete tunneling architecture for packet switching and routing in dual-homed access networks. It uses a shared virtual tunnel and a single virtualized source-device address to present multiple physical paths as one logical tunnel for transport and MAC learning. '230 patent at Abstract, 3:25–40.

83. The '230 patent addresses a technical problem in EVPN transport networks with dual-homed access. In a conventional dual-homed arrangement, each of a pair of transport devices provides an EVPN tunnel to a third transport device. *Id.* at 2:55–3:5. The third transport device may therefore receive EVPN packets from either of two tunnels. *See id.*

84. When end-user or client MAC addresses are preserved, the third transport device learns a given MAC address as associated with one of those two tunnel identifiers, even though

packets from the same end station may be transmitted through either tunnel. *Id.* at 3:5–15. Load-balancing or other transport logic can frequently change the selected tunnel. *Id.* at 3:10–20. Each change causes the third transport device to execute MAC learning again, constantly learning and relearning the same MAC address and creating substantial churn in the EVPN MAC-learning process. *Id.* at 3:15–25. The resulting forwarding-table changes increase processing load and can cause packet delays, packet loss, traffic disruption, and even device failure. *Id.* at 3:20–30. Constantly changing forwarding tables at the receiving device are themselves disruptive. *Id.* at 8:66–9:5.

85. The patent discloses a tunnel manager that creates a shared virtual tunnel so that the receiving device identifies a single virtual tunnel with two possible paths. *Id.* at 7:44–60. The tunnel manager assigns a third, shared virtualized source-device address representing both dual-homed transport devices. *Id.* at 7:60–8:15. Both transport devices use that common address while indicating different path identifiers for the respective paths. *Id.* at 9:1–15. From the receiving device's perspective, the two paths are therefore members of one logical tunnel rather than two separately learned tunnels. *See id.* Because MAC learning analyzes addresses, not the forwarding path selected for a particular packet, the receiving device learns the end station against the shared virtual address and the single virtual tunnel instead of repeatedly switching the learned association between two tunnel identifiers. *Id.* at 9:15–33, 9:5–15.

86. In operation, the tunnel manager encapsulates packets received from the dual-homed access network with the single virtualized source-device address and transmits the encapsulated packets through the shared virtual tunnel. *Id.* at 7:60–8:15. The receiving device, such as transport device 143, recognizes transmissions from the same end station as belonging to the same virtual tunnel even when successive packets arrive over different paths. *Id.* at 9:5–20.

The paths are tied to the forwarding process, while the shared virtual-tunnel address is tied to the learning process. *Id.* at 10:11–27. When transport device 143 later sends return traffic, it selects one of the two available paths at runtime; that is a forwarding decision, not a new learning decision. *See id.* at 9:25–33. The receiving device therefore does not constantly relearn the MAC address, effectively eliminating the MAC-learning churn associated with conventional dual-homed EVPN transport. *See id.* at 9:30–10:5.

87. Claim 1 recites the transport network, the first and second switching devices, the dual-homed connection, and the shared virtual tunnel defining a single virtualized source-device address. The claimed arrangement therefore specifies a concrete sequence for encapsulation, transport, and logical identity across redundant switching devices. *See id.* at 12:35–55.

88. Claim 4 specifies that the transport network uses an Ethernet-based Virtual Private Network protocol to transport data, including maintaining end-station source and destination Media Access Control addresses. *Id.* at 7:25–43. Claim 5 requires executing a MAC-learning process by identifying end-station locations linked to the single virtualized source-device address without using routing paths corresponding to that address as part of the MAC-learning process. In other words, the learning process deliberately disregards the path identifier and learns the end station only against the shared virtual address, even though the forwarding plane retains multiple paths for subsequent traffic. *See id.* at 9:15–33, 12:55–60.

89. The shared virtual tunnel avoids the instability inherent in conventional dual-tunnel learning. The receiving device learns the end station against the single virtual tunnel and common source identity rather than relearning it against whichever physical path carried the latest packet. *Id.* at 9:5–15. The forwarding plane may retain and select among the available paths at runtime without changing the logical tunnel identity used for learning. *Id.* at 10:11–27. Because the path

choice does not trigger a new MAC-learning event, the technique prevents constant table updates, reduces processing and CPU load, and minimizes delays, packet loss, and traffic disruption. *See id.* at 3:20–30, 10:20–30. It also avoids redirecting traffic merely to restore a learned tunnel association, which would create longer paths and higher latency. *See id.* at 3:30–40.

90. The ordered combination of EVPN transport, dual-homed switching devices, shared virtual-tunnel creation, a common virtualized source identity, path-specific encapsulation, and MAC learning is not a generic instruction to use a network. The tunnel manager creates a shared virtual tunnel spanning the two dual-homed transport devices and the receiving device, assigns both source devices the same virtual identity, encapsulates packets with that identity while preserving the path distinction for forwarding, and causes the receiving device to learn end-station reachability against the shared identity. *See id.* at 7:44–8:15, 9:1–33. These elements operate together as a particular tunneling and learning arrangement that changes how redundant paths are represented and *maintains end-station reachability* without allowing path changes to churn the receiving device's MAC table.

91. A person of ordinary skill in the art would understand that the shared virtual tunnel provides a concrete solution to MAC-learning instability in dual-homed EVPN networks. The common source identity prevents MAC-table churning even when load balancing changes the path used by successive packets. *See id.* at 9:5–33. The technique reduces processing and CPU loads, avoids constant table updates, minimizes packet delays and loss, and preserves the available redundant paths without requiring traffic redirection to a different or longer route. *See id.* at 3:20–30. It therefore improves the operation of the transport device and the network as a whole while retaining runtime path selection. *See id.* at 10:11–27, 11:55–67.

92. The '230 claims thus recite a concrete dual-homed tunneling pipeline: identify the

transport and access networks; identify the two redundant switching devices and the receiving switching device; create a shared virtual tunnel with a common source identity; preserve path-specific information for forwarding; encapsulate packets received through either dual-homed device; and perform stable MAC learning against the common identity while disregarding the corresponding routing paths. *See id.* at 7:44–8:15, 9:1–33, 12:35–60. The tunnel manager, shared identity, encapsulation operation, forwarding-plane path selection, and receiving-device learning process are not isolated generic networking functions; they cooperate to prevent MAC-table churn, minimize processor load, avoid constant table updates, and preserve low-latency forwarding. *See id.* at 3:25–40, 10:20–30. These operations improve the *functioning of the network itself*. *See id.* at 8:66–9:33, 10:11–27, 12:55–60.

93. The claims are directed to substantial, non-conventional contributions in shared virtual tunneling for dual-homed EVPN networks. A person of ordinary skill in the art would understand the claims as a non-conventional and non-generic arrangement of known networking components operating as an integrated pipeline: the tunnel manager creates a shared virtual tunnel and assigns a common source identity; the dual-homed devices encapsulate packets using that identity while retaining different forwarding paths; and the receiving device learns MAC addresses against the shared identity rather than the paths. *See id.* at 7:44–8:15, 9:1–33, 10:11–27. This arrangement eliminates the MAC-learning churn caused by alternating conventional tunnels, reduces CPU load and table updates, avoids packet delays and loss, and eliminates the need for traffic redirection that would produce longer paths and higher latencies. *See id.* at 3:20–40, 9:25–33, 10:20–30. The shared address and tunnel-learning operations therefore provide the claimed technical solution to instability in dual-homed EVPN transport.

**United States Patent No. 8,369,220**

94. On February 5, 2013, the United States Patent and Trademark Office duly and legally issued United States Patent No. 8,369,220, entitled ""Routing a Flow of Elastic Traffic." The '220 patent is attached as **Exhibit 5**.

95. The '220 patent names Bakul Khanna, Jozef Babiarz, Ali Labed, Delfin Montuno, and Hesham El-Bakoury as inventors.

96. PulseLink owns by assignment the entire right, title, and interest in and to the '220 patent, including all rights to sue and recover damages for past and future infringement.

97. The '220 patent "relates to routing a flow of elastic traffic." '220 patent at 1:20. "The types of traffic that can be communicated over a network include elastic traffic and inelastic traffic." *Id.* at 1:24-28. Inelastic traffic includes traffic "for which some minimum bandwidth must be guaranteed for proper performance." *Id.* at 1:26-28. "Elastic traffic, on the other hand, is more delay tolerant and has a characteristic that bandwidth for the flow of elastic traffic can be reduced." *Id.* at 1:28-30. "Elastic traffic refers to traffic for which the communications rate over the network can be reduced when available bandwidth is reduced, and for which the communications rate can be increased when the available bandwidth increases. An example of elastic traffic includes TCP (Transmission Control Protocol) traffic." *Id.* at 2:26-31.

98. The '220 patent identifies two problems with switch forwarding hardware that the routing protocols then in use produced. First, the path choice is made blind with respect to available alternatives. "Conventional routing protocols for elastic traffic do not provide for effective performance." *Id.* at 1:33-34. "Some routing protocols, for example, attempt to use shortest routing paths between given endpoints even though there may be other paths available in the network. This may result in the shortest routing paths becoming congested, while other routing paths may

continue to be under-utilized." *Id.* at 1:35-39. Second, the path choice is made without knowledge of path performance. "Other routing protocols may route traffic over various paths without any knowledge of whether a particular path is able to provide good or bad performance." *Id.* at 1:39-42. The first problem concentrates traffic on a subset of links while leaving capacity idle. The second problem spreads traffic without feedback, so the switch cannot distinguish a clear path from a congested one.

99. The '220 patent solves both identified failures through a two-branch path-selection structure performed by the switch. *Id.* at 5:46-9:60. In the first branch, "new elastic traffic flows are assigned in a round robin manner to all available candidate paths over which a number of traffic flows is less than a predefined minimum flow count (a predefined threshold)." *Id.* at 2:57-61. In the second branch, "after all candidate paths have achieved the predefined minimum flow count (in other words, each of the candidate paths has a number of traffic flows greater than the predefined minimum flow count), then the candidate path that is selected for a new elastic traffic flow is the path that is able to achieve a highest throughput based on measured performances." *Id.* at 2:61-67. The switch holds two per-link quantities to execute these decisions, e.g., "Ti is the total throughput of all TCP flows crossing a path (the outgoing link of that path) and traveling to a certain destination. Ni is the number of those TCP flows to the destination. Keeping a count of the number of TCP flows in the outgoing link of that path is straightforward." *Id.* at 7:16-24.

100. Figure 6 of the specification depicts the switch architecture, including: "an elastic flow path selection module 602 to perform path selection for elastic traffic flows," a "mixed flow path selection module 604 for performing path selection for mixed traffic flows," a "performance measurement module 606 to measure performance parameters (e.g., aggregate TCP flow throughput) of corresponding links," and a "load balancing module 608" that "performs load

balancing, such as load balancing for idle TCP flows." *Id.* at 9:33-46. The switch may store per-link state in a "link data structure 614 to store states of corresponding links connected to the switch 600. For example, a particular link may have experienced blackout, in which case the link data structure 614 can be updated to indicate that the particular link has experienced blackout. The link data structure can be updated when the link is no longer in a blackout condition." *Id.* at 9:46-56. The specification further teaches that "[t]he various modules 602, 604, 606, and 608 can be hardware modules, or alternatively, can be software modules executable on one or more central processing units (CPUs) 616 in the switch 600." *Id.* at 9:57-60.

101. The threshold for selecting between the paths exists because throughput measured over a sparsely loaded link misleads the switch, and the claimed method populates each path by count before it relies on performance data. The '220 patent generally identifies the measurement defect as follows: "one situation where achieving best throughput may not be realizable is when one or more of the TCP flows is a low throughput TCP flow. One example of a low throughput TCP flow is an acknowledgment flow, which is a flow for sending an acknowledgment message. Switches in some implementations may not be able to distinguish between a low throughput TCP flow and a normal throughput TCP flow." *Id.* at 7:25-31.

102. The solution to that problem is to seed each path with enough flows that statistical noise washes out. For instance, the patent explains that "by ensuring that each of the candidate paths to a given destination is carrying a minimum number of flows, MIN_NUMBER_FLOWS_PER_PATH, as discussed above, before assigning a new flow based on best throughput, the probability that all MIN_NUMBER_FLOWS_PER_PATH flows on a given link are low throughput is relatively low. The larger the threshold (MIN_NUMBER_FLOWS_PER_PATH), the lower the probability of all flows being low

throughput flows." *Id.* at 7:32-41.

103. The claimed measurement lets a switch act on downstream congestion it cannot observe directly. For example, the specification explains that "switch A has no knowledge about the load on link C-B (406). However, switch A does have an indication of that information in the average per-TCP flow throughput that is received by TCP flows traveling on A-C-B." *Id.* at 7:48-55. However, the per-destination throughput carries information about remote link conditions back to the local switch, converting an unobservable condition into a local, usable measurement.

104. A throughput measurement "can be made every t period, where $t_m$ is some predefined time value." *Id.* at 8:45-48. The throughput parameter "Th(k), thus represents the amount of data per unit of time ($t_m$)." *Id.* at 8:47-55. To stabilize the measurement, "some type of a smoothing approach, such as exponential moving averaging, that takes into account an aggregation of Th(0), Th(1), ... Th(k) can be performed." *Id.* at 8:65-9:1. The smoothed value avoids noise "by using ST, path selection can be based on smooth values of the measured throughput to avoid fluctuations." *Id.* at 9:5-9.

105. A POSITA would have understood that the '220 patent provides two innovative approaches to path selection, e.g., a per-destination approach and a per-nexthop approach, as well as a class dimension approach. First there is a per-destination approach, where "the load distribution aims to maximize the per-elastic traffic flow throughput. The consequence of this is that this approach tends to achieve the same throughput for TCP sessions (or other elastic traffic flow sessions) on the various candidate paths. The fairness is with respect to flows traveling to the same destination." *Id.* at 5:11-17. Second, there is a per-nexthop approach, which is "a variant of the per-destination approach, where the destination of the flow is no longer taken into account to load distribute the elastic flows on various candidate paths. In other words, the per-nexthop

approach is traffic distribution that is based only on load to the next hop; the new elastic traffic flows will be routed on the next hop that has the best per-elastic traffic flow throughput." *Id.* at 5:20-26. Regarding the class dimension, the "elastic traffic can also be differentiated into different classes, such as by using different DSCP values. Thus, path selection can also be based on identifying a flow of elastic traffic from among plural classes of elastic traffic. Different sets of candidate paths can be allocated to corresponding different classes of elastic traffic. Thus, based on an identified class, the candidate paths considered are those paths that are part of the set for the identified class of elastic traffic." *Id.* at 6:24-32.

106. A POSITA would have understood that the '220 patent addresses mixed traffic, failure conditions, and rebalancing. For mixed traffic containing both elastic and inelastic components, the patent describes distributing the mixed traffic "in a round-robin manner, among all candidate next hops. The number of mixed traffic flows on each candidate next hop is counted, and a new mixed traffic flow is assigned to the next hop that contains the least number of mixed traffic flows." *Id.* at 9:12-19. "In the presence of a blackout condition (where a portion of a network fails completely due to link or equipment failures or human configuration errors), the corresponding one or more failed paths are removed from the set of alternate candidate paths that are considered. Flows that are associated with the one or more failed paths are then moved to other paths." *Id.* at 3:1-7. The protocol also "protects against brownout conditions, where a portion of a network becomes temporarily unavailable." *Id.* at 4:57-62. For rebalancing existing flows "in the presence of long-lived TCP flows, or when a new alternate link has just become available, it is possible to have some links carrying TCP flows with high throughput, while other links are carrying low throughput TCP flows, for extended periods of time. In such cases, it may help to perform periodic, TCP-flow load balancing for existing, idle TCP flows to ensure well-balanced

TCP flows across all links." *Id.* at 9:20-25. The idleness requirement preserves order because "TCP flow would have to be idle for some predefined amount of time before being eligible for being moved to another link by the load-balancing mechanism. This ensures that this mechanism does not create out-of-order packets." *Id.* at 9:30-33.

107. A POSITA would have understood that the innovation enables routing "around congestion or failure points without noticeable service or quality of service (QoS) impact to users." *Id.* at 4:3-6. "Higher service (transport) availability is provided, since multiple QoS paths are available between source and destination, and if one path fails, new flows are automatically and quickly routed over other available paths." *Id.* at 3:6-10. "Higher network utilization for elastic traffic flows is also provided, since elastic traffic flows are distributed across all available paths (rather than focused on shortest paths as conventionally performed)." *Id.* at 4:10-13. Using the claimed invention, a POSITA would have understood that TCP timeouts decrease "by more efficiently using paths in a network for routing elastic traffic flows, congestion of any one path can be reduced such that timeouts associated with TCP or other sessions due to slow communications can be reduced." *Id.* at 4:19-24. The protocol applies broadly because "the routing protocol can be implemented in switches used in various different types of networks, such as local area networks (LANs), wide area networks (WANs), or other types of networks," (id. at 4:24-27) and "the elastic traffic flow routing protocol can be used for routing elastic traffic flow over different physical links or different virtual links." *Id.* at 4:44-46.

## <u>ACCUSED INSTRUMENTALITIES AND ACTIVITIES</u>

108. NVIDIA is a leading provider of data-center networking, DPU, and switching products and services. NVIDIA designs, manufactures, markets, sells, offers to sell, and imports into the United States a broad portfolio of graphics processing units, artificial intelligence

accelerators, data center networking hardware and software products.

109. NVIDIA is a full-stack computing infrastructure company whose data-center-scale offerings comprise compute and networking solutions that can scale to tens of thousands of GPU-accelerated servers interconnected to function as a single giant computer. NVIDIA's platform strategy brings together hardware, systems, software, algorithms, libraries, and services.

110. NVIDIA's Compute & Networking segment includes Data Center accelerated computing platforms, AI solutions, networking, and DGX Cloud. NVIDIA's networking offerings include end-to-end InfiniBand and Ethernet platforms consisting of network adapters, cables, DPUs, switch chips and systems, and a full software stack. According to NVIDIA, networking is integral to its offerings because AI/HPC workloads span thousands of compute nodes.

111. NVIDIA designs, develops, makes, uses, markets, sells, offers for sale, provides, and supports the Accused Instrumentalities throughout the United States, including in Texas and in this District. The Accused Instrumentalities, including their associated software, firmware, and/or services, practice the inventions claimed in the Asserted Patents, as described below. The Accused Instrumentalities collectively include the '785 Accused Instrumentalities, '614 Accused Instrumentalities, '431 Accused Instrumentalities, '230 Accused Instrumentalities and '220 Accused Instrumentalities. Each patent specific Accused Instrumentality below includes the hardware, firmware, software and services for each identified instrumentality.

112. The '785 Accused Instrumentalities include the NVIDIA BlueField Data Processing Unit ("DPU") and NVIDIA ConnectX SmartNIC / SuperNIC platform, including the BlueField and ConnectX hardware, the NVIDIA DOCA software framework, and the software that configures and operates them. The '785 Accused Instrumentalities further include NVIDIA's products with the same or similar features and functionality as the identified DPUs implementing

the identified DOCA flow. The ’785 Accused Instrumentalities further include the hardware, software, firmware and/or services identified in the exemplary claim chart attached as **Exhibit 6**.

113. The ’614 Accused Instrumentalities include NVIDIA’s switches and/or switching systems and services with overlay loop prevention. The ’614 Accused Instrumentalities include at least NVIDIA’s Spectrum-4 SN5000 Series, Spectrum-3 SN4000 Series, Spectrum-2 SN3000 Series, and Spectrum SN2000 Series switches running Cumulus Linux with EVPN Multihoming, split-horizon filtering, and Designated Forwarder mechanisms for VXLAN overlay loop prevention. The ’614 Accused Instrumentalities further include NVIDIA’s products with the same or similar features and functionality as the identified Spectrum switches and EVPN Multihoming loop-prevention functionality. On information and belief, NVIDIA’s Spectrum-4 SN5000 Series Switch operating with Cumulus Linux operates in substantially the same manner as the other ’614 Accused Instrumentalities. The ’614 Accused Instrumentalities further include NVIDIA’s products with the same or similar features and functionality of the identified switches. The ’614 Accused Instrumentalities further include the hardware, software, firmware and/or services identified in the exemplary claim chart attached as Exhibit 7.

114. The ’431 Accused Instrumentalities include NVIDIA’s switching systems and services that implement multicast failover and MLAG-related forwarding functionality. The ’431 Accused Instrumentalities include at least the NVIDIA Spectrum SN5000 series switch operating with NVIDIA Cumulus Linux in a PIM active-active MLAG configuration. The ’431 Accused Instrumentalities further include NVIDIA’s products with the same or similar features and functionality as the identified switches. The ’431 Accused Instrumentalities further include the hardware, software, firmware and/or services identified in the exemplary claim chart attached as Exhibit 8.

115. The ’230 Accused Instrumentalities include NVIDIA switches with dual-homed shared-tunnel encapsulation functionality. The ’230 Accused Instrumentalities include at least the NVIDIA Spectrum SN5000 series switch as deployed in an MLAG VXLAN active-active configuration with Cumulus Linux NOS. NVIDIA Spectrum SN5000 series comprises Ethernet switch systems designed for data-center fabrics. The ’230 Accused Instrumentalities further include NVIDIA’s products with the same or similar features and functionality as the identified switches. The ’230 Accused Instrumentalities further include the hardware, software, firmware and/or services identified in the exemplary claim chart attached as Exhibit 9.

116. The ’220 Accused Instrumentalities include NVIDIA Ethernet platform products including NVIDIA switches with adaptive routing for traffic-performance-measurement and selective-routing functionality, for example, the NVIDIA Spectrum-X Ethernet Platform, including its switches, SuperNICs, and the software that configures and operates them. The ’220 Accused Instrumentalities further include NVIDIA’s products with the same or similar features and functionality as the identified platform.

117. By building and deploying its data-center networking platform, products, features, software, firmware, and related services on PulseLink’s patented technologies, NVIDIA infringes, and induces and contributes to the infringement of, the Asserted Patents by making, using, selling, offering for sale, and/or importing into the United States the Accused Instrumentalities, including through its distributors, customers, subsidiaries, importers, consumers, and/or users. This has caused, and continues to cause, substantial and irreparable harm to PulseLink.

118. NVIDIA has infringed and is continuing to infringe one or more of the Asserted Patents by making, using, selling, offering to sell, and/or importing, and by actively inducing others to make, use, sell, offer to sell, and/or import the Accused Instrumentalities and by

contributing to the infringement of others.

119. NVIDIA has had actual knowledge and notice of the Asserted Patents, and its infringement thereof, prior to the filing of this Complaint and, alternatively, at least as of the filing of this Complaint. Such knowledge and notice constitute knowing pre-suit and post-suit induced infringement and contributory infringement and willful infringement.

120. Beginning in May 2026 and continuing through the filing of this Complaint, PulseLink engaged in licensing discussions with NVIDIA regarding the PulseLink patent portfolio. During these communications, PulseLink provided NVIDIA with express, actual notice of its infringement. Specifically, PulseLink expressly identified each of the Asserted Patents, provided infringement analysis to the corresponding accused NVIDIA products and functionalities, and provided claim charts illustrating NVIDIA's infringement. Consequently, NVIDIA has had actual knowledge of the Asserted Patents and its specific infringement thereof since at least May 2026.

121. On May 12, 2026, PulseLink provided notice to NVIDIA of each Asserted Patent and its infringement via a letter transmitted by email and certified mail (confirmed delivered May 16, 2026) addressed to NVIDIA's President & Chief Executive Officer; Vice President, General Counsel and Secretary; and Executive Vice President and Chief Financial Officer. The letter identified the Asserted Patents, NVIDIA's infringing products, and asked NVIDIA to commence licensing discussion and take a license.

122. On May 26, 2026, NVIDIA responded through Principal Litigation Counsel, acknowledging the notice, stating that NVIDIA would investigate, and requesting additional information for use in licensing discussions.

123. On June 25, 2026, PulseLink provided NVIDIA with further information regarding

its infringement of the PulseLink patent portfolio, including, for each Asserted Patent, an identification of NVIDIA's infringing products and functionality together with estimate of NVIDIA's infringing revenue. PulseLink further provided exemplary claim charts, including a detailed claim mapping of the '230 patent to NVIDIA's infringing products.

124. On July 2, 2026, Senior IP Litigation Counsel at NVIDIA responded, confirming receipt of the June 25 materials and stating that NVIDIA would review the materials and follow up to discuss next steps.

125. On July 27, 2026, PulseLink provided NVIDIA with further information regarding its infringement of the Asserted Patents, including identifying at least one infringed claim for each Asserted Patent and identifying the NVIDIA infringing products and functionality.

126. On August 3, 2026, NVIDIA confirmed receipt of the July 27 information and confirmed it will consider, as part of its ongoing review, the materials provided by PulseLink that provided NVIDIA with notice of the patents and notice of its infringement under 35 U.S.C. § 287.

127. On August 25, 2026, PulseLink provided NVIDIA with further details regarding NVIDIA's infringement of the Asserted Patents, including the identification of additional infringed claims for each Asserted Patent along with NVIDIA's infringing products and functionality.

128. On September 22, 2026, NVIDIA responded to PulseLink's above-detailed correspondence and failed to take a license.

129. Despite receiving detailed notice, claim charts, and multiple opportunities to engage in licensing discussions, NVIDIA has not taken a license to any of PulseLink's patents, including the Asserted Patents, or ceased its infringing activities.

130. Despite receiving actual notice on May 12, 2026, NVIDIA not only failed to seek

a license from PulseLink, but, on information and belief, took no remedial action to design around, avoid, or mitigate its infringement. Instead, NVIDIA consciously disregarded PulseLink's patent rights by continuing, without alteration or interruption, to make, use, sell, offer for sale, and import the Accused Instrumentalities. Furthermore, NVIDIA has continued to actively induce infringement by instructing, directing, and encouraging its customers to deploy and use the Accused Instrumentalities in the infringing manner described herein.

131. Alternatively, if NVIDIA lacked actual knowledge of the Asserted Patents prior to May 12, 2026, its ignorance was the result of willful blindness. As a sophisticated actor in a specialized market, NVIDIA possessed a subjective belief of a high probability that its Accused Instrumentalities practiced patented technologies. Furthermore, NVIDIA was acutely aware that PulseLink's predecessors-in-interest, Avaya and Alcatel-Lucent (Nokia), pioneered the exact technologies at issue and possessed foundational patent portfolios covering data-center networking, unified network packet processing and optimization, loop prevention in split-plane network architectures, multicast fast reroute, MAC-address learning in tunneled transport networks, and flow-based route optimization. Rather than conduct conventional clearance or investigate these known, foundational portfolios, NVIDIA deliberately shielded itself to avoid learning of the Asserted Patents.

132. On information and belief, NVIDIA took deliberate actions to avoid learning of PulseLink's patents, including the Asserted Patents, and of its own infringement prior to May 12, 2026. On information and belief, NVIDIA actively monitors patent activity in the fields in which it operates. On information and belief, notwithstanding that diligence and monitoring, NVIDIA deliberately declined to review or analyze PulseLink's patents in order to shield themselves from knowledge of their infringement. Alternatively, the licensing discussions placed NVIDIA on

notice of the Asserted Patents, and despite such notice, on information and belief, NVIDIA took deliberate actions to avoid investigating its infringement of the Asserted Patents.

133. At the latest, NVIDIA has had actual knowledge of each Asserted Patent, and of the infringing nature of the Accused Instrumentalities, since the filing and service of this Complaint, which identifies each Asserted Patent and describes NVIDIA's infringement on a limitation-by-limitation basis. NVIDIA's continued manufacture, sale, distribution, and support of the Accused Instrumentalities, and their continued instruction and encouragement of customers' infringing use of the Accused Instrumentalities, after the filing and service of this Complaint constitute, at a minimum, knowing post-suit induced infringement and contributory infringement.

134. In view of the foregoing, NVIDIA's direct and indirect infringement of the Asserted Patents, both before and after the filing of this Complaint, has been and continues to be willful, egregious, and characterized by a conscious disregard for PulseLink's patent rights. Despite receiving actual notice, NVIDIA has stubbornly refused to take any remedial action to cease its own direct infringement or to halt its active inducement and contribution to the infringement of others.

135. NVIDIA's continued infringement after receiving notice of the relevant patent portfolio, including each Asserted Patent, and after multiple opportunities to discuss and address the infringement allegations, has been deliberate and wanton and thus evidences willful infringement and supports enhanced damages under 35 U.S.C. § 284, as well as an exceptional-case finding under 35 U.S.C. § 285.

136. NVIDIA derives revenue, directly and indirectly, from the activities relating to the Accused Instrumentalities.

**COUNT I**
**Infringement of the '785 Patent**

137. PulseLink re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

138. PulseLink has not licensed or otherwise authorized NVIDIA to practice the inventions claimed in the ’785 patent.

139. NVIDIA has infringed and continues to directly and indirectly infringe at least claims 1, 2, 8, and 11 of the ’785 patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), (b), and (c), including by making, using, selling, offering for sale, and/or importing into in the United States the ’785 Accused Instrumentalities. As shown in the exemplary claim chart attached as **Exhibit 6**, the ’785 Accused Instrumentalities infringe at least claims 1, 2, 8, and 11.

140. NVIDIA has directly and continues to directly infringe through, for example, its development, internal operation, use, quality assurance, testing, and demonstration of the ’785 Accused Instrumentalities.

141. NVIDIA also directs and controls its customers’ and end users’ use of the ’785 Accused Instrumentalities.

142. NVIDIA has and continues to induce infringement under 35 U.S.C. § 271(b). NVIDIA indirectly infringes one or more claims of the ’785 patent by knowingly and intentionally inducing others, including NVIDIA customers and end-users of the ’785 Accused Instrumentalities, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include such infringing technology. NVIDIA has known of the ’785 patent at least since being contacted by PulseLink and no later than the filing date of the Complaint. Since at least that time, NVIDIA has been on notice of its infringement, and NVIDIA has actively induced infringement

by others, such as NVIDIA's customers and end users in this District and elsewhere in the United States, including entities operating large-scale, high-bandwidth data centers that require extreme network reliability and redundancy such as Hyperscale Cloud Providers; Enterprise Data Center Operators; AI Infrastructure Builders; High Performance Computing Centers and Telecommunications and Managed Service Providers, in this District and elsewhere in the United States.

143. For example, NVIDIA's customers and users directly infringe through their use and deployment of the '785 Accused Instrumentalities as NVIDIA instructs and intends, as shown in the exemplary claim chart. NVIDIA intends to cause, and has taken affirmative steps to induce infringement by its customers and end users by at least manufacturing, selling, distributing, and/or otherwise making available the '785 Accused Instrumentalities, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the '785 Accused Instrumentalities in an infringing manner, including through technical support, marketing, product manuals, advertisements, and online documentation. For example, NVIDIA takes deliberate, affirmative acts to instruct its customers on how to configure, deploy, and operate the '785 Accused Instrumentalities in an infringing manner. NVIDIA authors and distributes detailed documentation, such as the materials cited in the exemplary claim chart, and provides extensive enterprise support, professional services, training videos, and certifications designed to facilitate this use. *See, e.g.*, https://www.nvidia.com/en-us/support/; https://www.nvidia.com/en-us/support/enterprise/services/ (boasting that "NVIDIA's experts are here for you at every step" and offering "expansive support tiers, fast implementations, [and] robust professional services" to achieve success with its networking platform). Through this active encouragement, NVIDIA's customers and end-users operate the '785 Accused Instrumentalities exactly as NVIDIA intends,

thereby directly infringing the ’785 patent. NVIDIA undertakes these affirmative acts with the specific intent and knowledge that its customers will commit these infringing acts through their normal and customary use of the ’785 Accused Instrumentalities.

144. NVIDIA also knew or was willfully blind that its actions would induce infringement by others and intended that its actions would induce infringement by others. Accordingly, a reasonable inference is that NVIDIA specifically intended for others to directly infringe one or more claims of the ’785 patent in the United States because NVIDIA had knowledge of the ’785 patent and actively induced others (e.g., customers and users) to directly infringe the ’785 patent.

145. As alleged above, NVIDIA had prior knowledge of the ’785 patent and knew, should have known, or was willfully blind to the fact of NVIDIA’s infringement of the ’785 patent since that time.

146. NVIDIA has and continues to contribute to infringement under 35 U.S.C. § 271(c) by supplying, with knowledge of the ’785 patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial non-infringing use. NVIDIA has provided, owned, operated, sold, offered to sell, leased, licensed, used, and/or imported, and continues to do so, various hardware, firmware and/or software that make up and enable the ’785 Accused Instrumentalities, including as used in third-party (including customer and end user) systems (including as discussed in the exemplary claim chart), are a material part of the claimed invention, are not a staple article of commerce, and are incapable of substantial non-infringing uses. For example, NVIDIA makes, sells, offers to sell, and imports into the United States components that constitute a material part of the invention claimed in the ’785 patent, including the BlueField Data Processing Unit (“DPU”) and NVIDIA ConnectX SmartNIC /

SuperNIC platform, including the BlueField and ConnectX hardware, the NVIDIA DOCA software framework, and the software that configures and operates them to form a virtual graph of service modules, the fast-path and slow-path dual processing architecture, stateful connection-tracking decision logic that determines whether packets are eligible for hardware fast-path processing or must be redirected to software exception processing, and the optimization component that removes redundant primitive operations through relaxed matching, ordered list pipes, and pipes with multiple actions as described in the exemplary chart. NVIDIA knows that these components are specially made and adapted for use in infringing the ’785 patent as the DOCA Flow framework and Connection Tracking module exist to perform the accused packet-processing pipeline functionality, and when deployed as NVIDIA instructs, there is no substantial use of the DOCA Flow framework and Connection Tracking module that does not practice the claimed invention.

147. As explained above, NVIDIA’s infringement has been and continues to be willful in view of the facts asserted above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

148. PulseLink has suffered and continues to suffer substantial damages in an amount to be proven at trial.

## **COUNT II**
## **Infringement of the ’614 Patent**

149. PulseLink re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

150. PulseLink has not licensed or otherwise authorized NVIDIA to practice the inventions claimed in the ’614 patent.

151. NVIDIA has infringed and continues to directly and indirectly infringe at least

claims 1, 2, and 7 of the ’614 patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), (b), and (c), including by making, using, selling, offering for sale, and/or importing into in the United States the ’614 Accused Instrumentalities. As shown in the exemplary claim chart attached as **Exhibit 7**, the ’614 Accused Instrumentalities infringe at least claims 1, 2, and 7.

152. NVIDIA has directly and continues to directly infringe through, for example, its development, internal operation, use, quality assurance, testing, and demonstration of the ’614 Accused Instrumentalities.

153. NVIDIA also directs and controls its customers’ and end users’ use of the ’614 Accused Instrumentalities.

154. NVIDIA has and continues to induce infringement under 35 U.S.C. § 271(b). NVIDIA indirectly infringes one or more claims of the ’614 patent by knowingly and intentionally inducing others, including NVIDIA customers and end-users of the ’614 Accused Instrumentalities, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include such infringing technology. NVIDIA has known of the ’614 patent at least since being contacted by PulseLink and no later than the filing date of the Complaint. Since at least that time, NVIDIA has been on notice of its infringement, and NVIDIA has actively induced infringement by others, such as NVIDIA’s customers and end users in this District and elsewhere in the United States, including entities operating large-scale, high-bandwidth data centers that require extreme network reliability and redundancy such as Hyperscale Cloud Providers; Enterprise Data Center Operators; AI Infrastructure Builders; High Performance Computing Centers and Telecommunications and Managed Service Providers, in this District and elsewhere in the United

States.

155. For example, NVIDIA's customers and users directly infringe through their use and deployment of the '614 Accused Instrumentalities as NVIDIA instructs and intends, as shown in the exemplary claim chart. NVIDIA intends to cause, and has taken affirmative steps to induce infringement by its customers and end users by at least manufacturing, selling, distributing, and/or otherwise making available the '614 Accused Instrumentalities, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the '614 Accused Instrumentalities in an infringing manner, including through technical support, marketing, product manuals, advertisements, and online documentation. For example, NVIDIA takes deliberate, affirmative acts to instruct its customers on how to configure, deploy, and operate the '614 Accused Instrumentalities in an infringing manner. NVIDIA authors and distributes detailed documentation, such as the materials cited in the exemplary claim chart, and provides extensive enterprise support, professional services, training videos, and certifications designed to facilitate this use. See, e.g., https://www.nvidia.com/en-us/support/; https://www.nvidia.com/en-us/support/enterprise/services/ (boasting that "NVIDIA's experts are here for you at every step" and offering "expansive support tiers, fast implementations, [and] robust professional services" to achieve success with its networking platform). Through this active encouragement, NVIDIA's customers and end-users operate the '614 Accused Instrumentalities exactly as NVIDIA intends, thereby directly infringing the '614 patent. NVIDIA undertakes these affirmative acts with the specific intent and knowledge that its customers will commit these infringing acts through their normal and customary use of the '614 Accused Instrumentalities.

156. NVIDIA also knew or was willfully blind that its actions would induce infringement by others and intended that its actions would induce infringement by others.

Accordingly, a reasonable inference is that NVIDIA specifically intended for others to directly infringe one or more claims of the ’614 patent in the United States because NVIDIA had knowledge of the ’614 patent and actively induced others (e.g., customers and users) to directly infringe the ’614 patent.

157. As alleged above, NVIDIA had prior knowledge of the ’614 patent and knew, should have known, or was willfully blind to the fact of NVIDIA’s infringement of the ’614 patent since that time.

158. NVIDIA has and continues to contribute to infringement under 35 U.S.C. § 271(c) by supplying, with knowledge of the ’614 patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial non-infringing use. NVIDIA has provided, owned, operated, sold, offered to sell, leased, licensed, used, and/or imported, and continues to do so, various hardware, firmware and/or software that make up and enable the ’614 Accused Instrumentalities, including as used in third-party (including customer and end user) systems (including as discussed in the exemplary claim chart), are a material part of the claimed invention, are not a staple article of commerce, and are incapable of substantial non-infringing uses. For example, NVIDIA makes, sells, offers to sell, and imports into the United States components that constitute a material part of the invention claimed in the ’614 patent, including the EVPN Multihoming, split-horizon filtering, and Designated Forwarder software components within the identified Spectrum series switches running Cumulus Linux, whose specific and combined function is to perform VXLAN overlay loop prevention as described in the exemplary chart. NVIDIA knows that these components are specially made and adapted for use in infringing the ’614 patent. The EVPN Multihoming, split-horizon filtering, and Designated Forwarder components exist to identify the unified switch topology, determine when a virtual path

causes a loop, and forward through the permitted physical alternative—the specific loop-prevention functionality claimed in the ’614 patent. When deployed in the EVPN Multihoming configuration, as NVIDIA instructs in its technical documentation, there is no substantial use of the combined EVPN Multihoming, split-horizon filtering and Designated Forwarder components that does not practice the claimed invention.

159. As explained above, NVIDIA’s infringement has been and continues to be willful in view of the facts asserted above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

160. PulseLink has suffered and continues to suffer substantial damages in an amount to be proven at trial.

## COUNT III
## Infringement of the ’431 Patent

161. PulseLink re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

162. PulseLink has not licensed or otherwise authorized NVIDIA to practice the inventions claimed in the ’431 patent.

163. NVIDIA has infringed and continues to directly and indirectly infringe at least claims 1, 3, and 5 of the ’431 patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), (b), and (c), including by making, using, selling, offering for sale, and/or importing into in the United States the ’431 Accused Instrumentalities. As shown in the exemplary claim chart attached as **Exhibit 8**, the ’431 Accused Instrumentalities infringe at least claims 1, 3, and 5.

164. NVIDIA has directly and continues to directly infringe through, for example, its development, internal operation, use, quality assurance, testing, and demonstration of the ’431

Accused Instrumentalities.

165. NVIDIA also directs and controls its customers' and end users' use of the '431 Accused Instrumentalities.

166. NVIDIA has and continues to induce infringement under 35 U.S.C. § 271(b). NVIDIA indirectly infringes one or more claims of the '431 patent by knowingly and intentionally inducing others, including NVIDIA customers and end-users of the '431 Accused Instrumentalities, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include such infringing technology. NVIDIA has known of the '431 patent at least since being contacted by PulseLink and no later than the filing date of the Complaint. Since at least that time, NVIDIA has been on notice of its infringement, and NVIDIA has actively induced infringement by others, such as NVIDIA's customers and end users in this District and elsewhere in the United States, including entities operating large-scale, high-bandwidth data centers that require extreme network reliability and redundancy such as Hyperscale Cloud Providers; Enterprise Data Center Operators; AI Infrastructure Builders; High Performance Computing Centers and Telecommunications and Managed Service Providers, in this District and elsewhere in the United States.

167. For example, NVIDIA's customers and users directly infringe through their use and deployment of the '431 Accused Instrumentalities as NVIDIA instructs and intends, as shown in the exemplary claim chart. NVIDIA intends to cause, and has taken affirmative steps to induce infringement by its customers and end users by at least manufacturing, selling, distributing, and/or otherwise making available the '431 Accused Instrumentalities, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the '431

Accused Instrumentalities in an infringing manner, including through technical support, marketing, product manuals, advertisements, and online documentation. For example, NVIDIA takes deliberate, affirmative acts to instruct its customers on how to configure, deploy, and operate the '431 Accused Instrumentalities in an infringing manner. NVIDIA authors and distributes detailed documentation, such as the materials cited in the exemplary claim chart, and provides extensive enterprise support, professional services, training videos, and certifications designed to facilitate this use. See, e.g., https://www.nvidia.com/en-us/support/; https://www.nvidia.com/en-us/support/enterprise/services/ (boasting that "NVIDIA's experts are here for you at every step" and offering "expansive support tiers, fast implementations, [and] robust professional services" to achieve success with its networking platform). Through this active encouragement, NVIDIA's customers and end-users operate the '431 Accused Instrumentalities exactly as NVIDIA intends, thereby directly infringing the '431 patent. NVIDIA undertakes these affirmative acts with the specific intent and knowledge that its customers will commit these infringing acts through their normal and customary use of the '431 Accused Instrumentalities.

168. NVIDIA also knew or was willfully blind that its actions would induce infringement by others and intended that its actions would induce infringement by others. Accordingly, a reasonable inference is that NVIDIA specifically intended for others to directly infringe one or more claims of the '431 patent in the United States because NVIDIA had knowledge of the '431 patent and actively induced others (e.g., customers and users) to directly infringe the '431 patent.

169. As alleged above, NVIDIA had prior knowledge of the '431 patent and knew, should have known, or was willfully blind to the fact of NVIDIA's infringement of the '431 patent since that time.

170. NVIDIA has and continues to contribute to infringement under 35 U.S.C. § 271(c) by supplying, with knowledge of the ’431 patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial non-infringing use. NVIDIA has provided, owned, operated, sold, offered to sell, leased, licensed, used, and/or imported, and continues to do so, various hardware, firmware and/or software that make up and enable the ’431 Accused Instrumentalities, including as used in third-party (including customer and end user) systems (including as discussed in the exemplary claim chart), are a material part of the claimed invention, are not a staple article of commerce, and are incapable of substantial non-infringing uses. For example, NVIDIA makes, sells, offers to sell, and imports into the United States components that constitute a material part of the invention claimed in the ’431 patent, including the Spectrum series switches implementing multicast failover and MLAG-related forwarding functionality. NVIDIA knows that these components are specially made and adapted for use in infringing the ’431 patent as the multicast failover and MLAG-related forwarding functionality exist to perform the accused multicast fast-reroute functionality, and when deployed as NVIDIA instructs, there is no substantial use of the implementing multicast failover and MLAG-related forwarding components that does not practice the claimed invention. NVIDIA further knows that these products are routinely implemented by organizations operating large-scale, high-bandwidth data centers that require extreme network reliability and redundancy such as Hyperscale Cloud Providers; Enterprise Data Center Operators; AI Infrastructure Builders; High Performance Computing Centers and Telecommunications and Managed Service Providers.

171. As explained above, NVIDIA’s infringement has been and continues to be willful in view of the facts asserted above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

172. PulseLink has suffered and continues to suffer substantial damages in an amount to be proven at trial.

**COUNT IV**
**Infringement of the ’230 Patent**

173. PulseLink re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

174. PulseLink has not licensed or otherwise authorized NVIDIA to practice the inventions claimed in the ’230 patent.

175. NVIDIA has infringed and continues to directly and indirectly infringe at least claims 1, 4, and 5 of the ’230 patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), (b), and (c), including by making, using, selling, offering for sale, and/or importing into in the United States the ’230 Accused Instrumentalities. As shown in the exemplary claim chart attached as **Exhibit 9**, the ’230 Accused Instrumentalities infringe at least claims 1, 4, and 5.

176. NVIDIA has directly and continues to directly infringe through, for example, its development, internal operation, use, quality assurance, testing, and demonstration of the ’230 Accused Instrumentalities.

177. NVIDIA also directs and controls its customers’ and end users’ use of the ’230 Accused Instrumentalities.

178. NVIDIA has and continues to induce infringement under 35 U.S.C. § 271(b). NVIDIA indirectly infringes one or more claims of the ’230 patent by knowingly and intentionally inducing others, including NVIDIA customers and end-users of the ’230 Accused Instrumentalities, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that

include such infringing technology. NVIDIA has known of the ’230 patent at least since being contacted by PulseLink and no later than the filing date of the Complaint. Since at least that time, NVIDIA has been on notice of its infringement, and NVIDIA has actively induced infringement by others, such as NVIDIA’s customers and end users, including entities operating large-scale, high-bandwidth data centers that require extreme network reliability and redundancy such as Hyperscale Cloud Providers; Enterprise Data Center Operators; AI Infrastructure Builders; High Performance Computing Centers and Telecommunications and Managed Service Providers, in this District and elsewhere in the United States.

179. For example, NVIDIA’s customers and users directly infringe through their use and deployment of the ’230 Accused Instrumentalities as NVIDIA instructs and intends, as shown in the exemplary claim chart. NVIDIA intends to cause, and has taken affirmative steps to induce infringement by its customers and end users by at least manufacturing, selling, distributing, and/or otherwise making available the ’230 Accused Instrumentalities, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the ’230 Accused Instrumentalities in an infringing manner, including through technical support, marketing, product manuals, advertisements, and online documentation. For example, NVIDIA takes deliberate, affirmative acts to instruct its customers on how to configure, deploy, and operate the ’230 Accused Instrumentalities in an infringing manner. NVIDIA authors and distributes detailed documentation, such as the materials cited in the exemplary claim chart, and provides extensive enterprise support, professional services, training videos, and certifications designed to facilitate this use. See, e.g., https://www.nvidia.com/en-us/support/; https://www.nvidia.com/en-us/support/enterprise/services/ (boasting that “NVIDIA’s experts are here for you at every step” and offering “expansive support tiers, fast implementations, [and] robust professional services” to

achieve success with its networking platform). Through this active encouragement, NVIDIA's customers and end-users operate the '230 Accused Instrumentalities exactly as NVIDIA intends, thereby directly infringing the '230 patent. NVIDIA undertakes these affirmative acts with the specific intent and knowledge that its customers will commit these infringing acts through their normal and customary use of the '230 Accused Instrumentalities.

180. NVIDIA also knew or was willfully blind that its actions would induce infringement by others and intended that its actions would induce infringement by others. Accordingly, a reasonable inference is that NVIDIA specifically intended for others to directly infringe one or more claims of the '230 patent in the United States because NVIDIA had knowledge of the '230 patent and actively induced others (e.g., customers and users) to directly infringe the '230 patent.

181. As alleged above, NVIDIA had prior knowledge of the '230 patent and knew, should have known, or was willfully blind to the fact of NVIDIA's infringement of the '230 patent since that time.

182. NVIDIA has and continues to contribute to infringement under 35 U.S.C. § 271(c) by supplying, with knowledge of the '230 patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial non-infringing use. NVIDIA has provided, owned, operated, sold, offered to sell, leased, licensed, used, and/or imported, and continues to do so, various hardware, firmware and/or software that make up and enable the '230 Accused Instrumentalities, including as used in third-party (including customer and end user) systems (including as discussed in the exemplary claim chart), are a material part of the claimed invention, are not a staple article of commerce, and are incapable of substantial non-infringing uses. For example, NVIDIA makes, sells, offers to sell, and imports into the United

States components that constitute a material part of the invention claimed in the ’230 patent, including the MLAG VXLAN active-active and EVPN software components within the Spectrum series switches running Cumulus Linux NOS, whose specific and combined function is to create a shared virtual tunnel with a single virtualized source-device address for dual-homed access networks, as described in the exemplary chart. NVIDIA knows that these components are specially made and adapted for use in infringing the ’230 patent. The MLAG VXLAN active-active and EVPN components exist to create the shared virtual tunnel using the anycast VTEP address, encapsulate packets with the single virtualized source identity, and cause remote VTEPs to learn MAC addresses against that shared identity—the specific dual-homed tunneling and MAC-learning functionality claimed in the ’230 patent. When deployed in the MLAG VXLAN active-active configuration as NVIDIA instructs in its technical documentation, there is no substantial use of the combined MLAG VXLAN active-active and EVPN components that does not practice the claimed invention.

183. As explained above, NVIDIA’s infringement has been and continues to be willful in view of the facts asserted above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

184. PulseLink has suffered and continues to suffer substantial damages in an amount to be proven at trial.

## COUNT V
## Infringement of the ’220 Patent

185. PulseLink re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

186. PulseLink has not licensed or otherwise authorized NVIDIA to practice the inventions claimed in the ’220 patent.

187. NVIDIA has infringed and continues to directly and indirectly infringe at least claims 1-14 of the '220 patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271(a), (b), and (c), including by making, using, selling, offering for sale, and/or importing into in the United States the '220 Accused Instrumentalities. As shown in the exemplary claim chart attached as **Exhibit 10**, the '220 Accused Instrumentalities infringe at least claims 1-14.

188. NVIDIA has directly and continues to directly infringe through, for example, its development, internal operation, use, quality assurance, testing, and demonstration of the '220 Accused Instrumentalities.

189. NVIDIA also directs and controls its customers' and end users' use of the '220 Accused Instrumentalities.

190. NVIDIA has and continues to induce infringement under 35 U.S.C. § 271(b). NVIDIA indirectly infringes one or more claims of the '220 patent by knowingly and intentionally inducing others, including NVIDIA customers and end-users of the '220 Accused Instrumentalities, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling, and/or importing into the United States products that include such infringing technology. NVIDIA has known of the '220 patent at least since being contacted by PulseLink and no later than the filing date of the Complaint. Since at least that time, NVIDIA has been on notice of its infringement, and NVIDIA has actively induced infringement by others, such as NVIDIA's customers and end users, including entities operating large-scale, high-bandwidth data centers that require extreme network reliability and redundancy such as Hyperscale Cloud Providers; Enterprise Data Center Operators; AI Infrastructure Builders; High Performance Computing Centers and Telecommunications and Managed Service Providers, in this

District and elsewhere in the United States.

191. For example, NVIDIA's customers and users directly infringe through their use and deployment of the '220 Accused Instrumentalities as NVIDIA instructs and intends, as shown in the exemplary claim chart. NVIDIA intends to cause, and has taken affirmative steps to induce infringement by its customers and end users by at least manufacturing, selling, distributing, and/or otherwise making available the '220 Accused Instrumentalities, and providing instructions, documentation, and other information to customers and end-users suggesting that they use the '220 Accused Instrumentalities in an infringing manner, including through technical support, marketing, product manuals, advertisements, and online documentation. For example, NVIDIA takes deliberate, affirmative acts to instruct its customers on how to configure, deploy, and operate the '220 Accused Instrumentalities in an infringing manner. NVIDIA authors and distributes detailed documentation, such as the materials cited in the exemplary claim chart, and provides extensive enterprise support, professional services, training videos, and certifications designed to facilitate this use. See, e.g., https://www.nvidia.com/en-us/support/; https://www.nvidia.com/en-us/support/enterprise/services/ (boasting that "NVIDIA's experts are here for you at every step" and offering "expansive support tiers, fast implementations, [and] robust professional services" to achieve success with its networking platform). Through this active encouragement, NVIDIA's customers and end-users operate the '220 Accused Instrumentalities exactly as NVIDIA intends, thereby directly infringing the '220 patent. NVIDIA undertakes these affirmative acts with the specific intent and knowledge that its customers will commit these infringing acts through their normal and customary use of the '220 Accused Instrumentalities.

192. NVIDIA also knew or was willfully blind that its actions would induce infringement by others and intended that its actions would induce infringement by others.

Accordingly, a reasonable inference is that NVIDIA specifically intended for others to directly infringe one or more claims of the ’220 patent in the United States because NVIDIA had knowledge of the ’220 patent and actively induced others (e.g., customers and users) to directly infringe the ’220 patent.

193. As alleged above, NVIDIA had prior knowledge of the ’220 patent and knew, should have known, or was willfully blind to the fact of NVIDIA’s infringement of the ’220 patent since that time.

194. NVIDIA has and continues to contribute to infringement under 35 U.S.C. § 271(c) by supplying, with knowledge of the ’220 patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial non-infringing use. NVIDIA has provided, owned, operated, sold, offered to sell, leased, licensed, used, and/or imported, and continues to do so, various hardware, firmware and/or software that make up and enable the ’220 Accused Instrumentalities, including as used in third-party (including customer and end user) systems (including as discussed in the exemplary claim chart), are a material part of the claimed invention, are not a staple article of commerce, and are incapable of substantial non-infringing uses. For example, NVIDIA makes, sells, offers to sell, and imports into the United States components that constitute a material part of the invention claimed in the ’220 patent, including the Spectrum-X Ethernet Platform incorporating the Spectrum series switches with the RoCE Adaptive Routing functionality as described in the exemplary chart. NVIDIA knows that these components are specially made and adapted for use in infringing the ’220 patent as the RoCE Adaptive Routing components exist to perform the accused traffic-performance-measurement and selective-routing functionality, and when deployed as NVIDIA instructs, there is no substantial use of the RoCE Adaptive Routing components that does not practice the claimed invention.

195. As explained above, NVIDIA's infringement has been and continues to be willful in view of the facts asserted above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

196. PulseLink has suffered and continues to suffer substantial damages in an amount to be proven at trial.

## COMPLIANCE WITH 35 U.S.C. § 287

197. PulseLink has not itself made, offered for sale, sold, or imported products practicing the Asserted Patents that would require marking under 35 U.S.C. § 287(a).

198. PulseLink seeks damages consistent with the notice and marking requirements of § 287. The marking requirement does not apply because PulseLink presently asserts method claims as to the '614, '431, '230 and '220 patents. As to the '785 patent, PulseLink only seeks damages from May 12, 2026 onward and no later than the date of the Complaint onward.

199. PulseLink has complied with § 287 to the extent applicable and reserves the right to supplement these allegations as discovery and the investigation of predecessor products and marking practices proceed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

a. A judgment that NVIDIA has infringed, directly and indirectly, literally or under the doctrine of equivalents, one or more claims of the Asserted Patents;

b. An award of damages to which PulseLink is entitled under 35 U.S.C. § 284 for NVIDIA's past infringement and any continuing or future infringement post-trial up until the date a final judgment is entered, including both compensatory damages and enhanced damages for willful infringement;

c. PulseLink's actual damages in an amount sufficient to compensate PulseLink for NVIDIA's infringement of the Asserted Patents until such time as NVIDIA ceases its infringing conduct, including supplemental damages post-verdict;

d. A judgment and order against NVIDIA for exemplary damages as determined by the trier of fact;

e. A judgment that NVIDIA's infringement has been willful;

f. Pre- and post-judgment interest as allowed by law on any damages awarded to PulseLink;

g. A declaration that this action is exceptional pursuant to 35 U.S.C. § 285, and an award to PulseLink of its attorneys' fees, costs, and expenses incurred in connection with this action;

h. A judgment and order requiring NVIDIA to pay PulseLink compulsory ongoing licensing fees, as determined by the Court in equity; and

i. Such other and further relief as this Court shall deem appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, PulseLink hereby demands a trial by jury as to all issues so triable.

## RESERVATION OF RIGHTS

Plaintiff's investigation is ongoing, and certain material information remains in the sole possession of the Defendant or third parties, which will be obtained via discovery herein. Plaintiff expressly reserves the right to amend or supplement the causes of action set forth herein in accordance with Rule 15 of the Federal Rules of Civil Procedure.

Dated: September 29, 2026

Respectfully submitted,

By: *<u>/s/ Blair M. Jacobs by permission Claire Henry</u>*

Blair M. Jacobs (VA Bar No. 32010)
bjacobs@bsfllp.com
Christina A. Ondrick (VA Bar No. 45736)
condrick@bsfllp.com
John S. Holley (TX Bar No. 24078678)
jholley@bsfllp.com
John Wittenzellner (PA Bar No. 308996)
jwittenzellner@bsfllp.com
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave. N.W.
Washington D.C. 20005
Tel: (202) 237-2727
Fax: (202) 237-6131

Andrea L. Fair
Texas Bar No. 24078488
andrea@millerfairhenry.com
Claire A. Henry
Texas Bar No. 24053063
claire@millerfairhenry.com
Garrett C. Parish
Texas Bar No. 24125824
garret@millerfairhenry.com
**MILLER FAIR HENRY PLLC**
1507 Bill Owens Parkway
Longview, Texas 75604
Tel: (903) 757-6400
Fax: (903) 757-2323

*Attorneys for Plaintiff*
*PulseLink Systems, LLC*